## CLARK et al. *v.* PRESTON, Executor.

Where a testator, after making various dispositions in a will in which he evidently intended to dispose of his whole property, declares as follows: "I give the rest and residue of my estate to my brother, and the legal heirs at law of my deceased wife, in equal proportions; this residue, if any shall remain after the payment of debts and legacies, will consist in notes due me at New Orleans, the joint property of the estate of myself and my late wife"— the words "this residue, &c. will consist in notes due me at New Orleans, &c.", being mere words of description, will not be considered as limiting the generality of the phrase "rest and residue of my estate" to notes due to the testator at New Orleans.

Where the language of a testament leaves the meaning of the testator doubtful, acts done by him after its execution, may be taken into consideration, as explanatory of his intentions. C. C. 1708.

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J.
*Peyton*, and *I. W. Smith*, for the plaintiffs, cited *Jackson v. Sill*, 11 Johns, 217. *Mann v. Mann*, 14 Ib. 11. *Doe v. Roe*, 1 Wendell, 541.

*Preston*, appellant, *pro se*, cited C. C. 1710. *Lartigue v. Duhamel*, 4 Mart. N. S. 664. *Thrall v. Thrall*, 7 La. 230. *Sarce v. Dunoyer*, 11 La. 223.

The judgment of the court was pronounced by

SLIDELL, J. In the year 1830, *James Brown*, the testator, sold to *Humphreys*, his co-proprietor, an interest of one-sixth in a certain plantation and slaves in Louisiana, for the sum of $18,000, payable by an appropriation of one-sixth of the sugar crop yearly, during four years; the debt however, if not thus satisfied, to become at all events due in four years from the day of sale. *Brown* and his wife were in community at the time of the sale. She died soon after. Her one-half interest in this debt passed to her legatees, and *Brown* remained the owner of the other half as surviving partner in community. The testator made his will, in 1832. At that time this debt was outstanding. A portion of it was subsequently paid by *Humphreys*, during *Brown's* lifetime; the residue was collected after his death, from the heirs of *Humphreys*; and a portion of this residue is now claimed from the executor, by the plaintiffs, as legatees of *John Brown*, who contend that *James Brown's* interest in this debt passed, by his will, to *John Brown*, as residuary legatee; while, on the contrary, the executor, *Preston*, contends that the fund belongs either to the plaintiffs in connection with certain other legatees under *James Brown's* will, or to his heirs generally.

The clause in the will of *James Brown*, which is the main subject of this controversy, is in these words: "I give the rest and residue of my estate to my brother *John Brown*, and the legal heirs at law of my deceased wife, in equal proportions; this residue, if any shall remain after payment payment of debts and legacies, will consist in notes due me at New Orleans, the joint property of the estate of myself and my late wife." This clause is the last clause of bequest in the will. The will commences by directing the dispositions of

his wife's will to be respected as to her half in the plantation and slaves, and in a house in New Orleans; it then directs that the other half of said possessions in Louisiana, that is to say the plantation, with its appurtenances in slaves and utensils, &c., should be sold by his executors, or worked in partnership with the co-proprietor, *Humphreys*, and the amount of sales or of annual proceeds divided as follows : one-half to his brother *John Brown*, and the two children of his brother *Samuel Brown;* the remaining half equally between his sister *Mary*, and the children of his sister *Elizabeth*, and those of his brother *Preston Brown;* " or, in other words, that I may be considered as having died intestate, except as to the preference given to the children of my brother *Samuel*, and to my brother *John*." The next clause gives to a neice certain jewels. The next, to another neice, $1,000. The next, the like amount to a sister-in-law and her daughter. The next, the like amount to another neice ; and then follows the residuary bequest quoted. The testator concludes with the following de-claration : " The cholera has rendered this disposition of my property urgent; and I adjure my heirs not to go at law about my estate, as whatever may be found after my death has been the fruit of my own industry. My wish has ever been kindness and justice to all my relatives and connections."

It is our duty to ascertain the intention of the testator in this clause ; and, in doing so, we must compare it with other parts of the will, and so interpret it, if possible, that the whole may harmonise and have effect. The first impres-sion created on the mind by the perusal of this will is, that the testator intended to dispose of his whole property; that it should cover every thing which he might leave behind him. This results not only from the general frame of the will, and from the large and comprehensive expressions of the following specific legacies—" I give the rest and residue of my estate to my brother *John Brown*, and the legal heirs at law of 'my deceased wife, in equal proportions"—but also from the concluding expression, in which he affectionately entreats his heirs not to disturb the execution of his wishes—"whatever may be found after my death has been the fruit of my own industry." These words clearly indicate that, he intended by his will to dispose of all that he should leave behind him.

But it is said that the concluding expressions of the contested clause limit the generality of the antecedent, and restrict this residuary legacy to " notes due at New Orleans," and that, as the *Humphreys'* debt never existed in the form of a note or notes, it does not therefore fall within the bounty of the testator. This interpretation is at war with that intention to dispose of all that the testa-tor should leave at his death, which, as we have said, is plainly deducible from the rest of the will. Are these expressions then susceptible of any other in-terpretation, which will harmonise with the rest of the will? If they are, we are bound to adopt it.

The language is "*will* consist in notes due at New Orleans." The words are not in the present, but the future. They may be considered as indicative of his expectation that his assets will ultimately assume that form. That such may have been his expectation is in accordance with the written instructions subsequently given to his agent at New Orleans, *Erwin*, in which he directs *Er-win* to make investments there of moneys that may come into his hands either in bank stock or safe notes. These subsequent acts of the testator, as explanatory of his will, we are authorised to consider by article 1708 of the Civil Code.

But because the testator entertained the expectation that his assets would, at a future time, assume the form of notes, it would be unreasonable to say that

his bounty to his brother, named as the legatee of the rest and residue of his estate, was intended to be contingent on the mere form in which his assets should exist at the time of his death. The transmutation of his assets into notes would require time, and would depend upon the contingency of meeting with satisfactory securities of that nature. But the testator cannot be supposed, from the terms of his will, to have looked forward with certainty to the possibility of doing so. He was, as the will shows, impressed with a sense, not only of the general uncertainty of life, but of an unusual danger. A pestilence which had spread terror and destruction throughout the country, was prevailing. It was a disease which destroyed suddenly. The testator saw himself surrounded by its devastation. The next week, or the next day, might find him a victim, and under such circumstances he applies himself to the making of his will, with a manifest desire to dispose of all "the fruits of his industry which may be found after his death." Now the testator cannot be supposed to have been ignorant of, or to have forgotten, this large debt of $18,000. But if death should overtake him speedily, this large debt could not be realised so as to accomplish his expectation of one day investing its proceeds in notes. Yet if the interpretation claimed by the defendant be the true one, the disposition of a very important item of "the rest and residue" of the testator's estate would have been left contingent and uncertain.

If, instead of regarding the language of the testator as expressive of an expectation that the residue of his estate would, at a future day, be found in the form of notes, we treat the words "notes due at New Orleans" as an enumeration, we would not be justified in considering the general and highly comprehensive words, "rest and residue of my estate," as restrained by the subsequent enumeration. This case is a stronger one in favor of the residuary legatee, than some that are to be found in the books. Thus where a man gave the remainder of his estate, viz, his Bank stock, India stock, South-Sea stock, and South-Sea annuities, to his son, and appointed him sole executor, it was held that the words following the "viz" were added by way of enumeration, or description, only of the chief particulars whereof his estate consisted, and did not restrain the word "estate" to those particulars. See Ward on Legacies (214), and the cases there cited.

Looking even to the expressions "notes due me at New Orleans," apart from the antecedent words, we are not prepared to say that they should be so rigorously construed as not to comprehend the *Humphreys'* debt. That debt was evidenced by a written promise to pay, embodied in the written act of sale.

It is said that by this interpretation of the will, *John Brown* is largely preferred to the other relatives, for all of whom the testator professed an affectionate regard, and a desire to do them justice. The preference created by the clause in question does not stand alone in this will. A preference was also given to him in an antecedent clause, which distributes the proceeds of specific property. The testator was the rightful judge of what was just in the distribution of his property; for, as he declared in his earnest and solemn appeal to them not to go to law about his estate, it was the fruit of his own industry. It is also worthy of remark that, with a single exception, *John Brown* was the nearest relative named in the will.

The argument is unsound, which the defendant derives from the expressions in an antecedent clause—"in other words that I may be considered as having died intestate, except as to the preference given," &c. These expressions

clearly relate to the specific property there disposed of; and the interpretation claimed by the defendant would be utterly inconsistent with all the subsequent dispositions, both specific and residuary.

CLARK<br>v.<br>PRESTON.

It is contended that the debt in question was covered by the antecedent clause in the will, which disposes of the plantation and slaves. In support of this argument it is urged, that this price of the one-sixth sold to *Humphreys*, was part of the capital of the partnership, which, at the date of that sale, and by the same act, was formed between *Brown* and *Humphreys*. We do not so regard it. It was a matter distinct from the partnership. Although the debt was to be paid by the yearly appropriation of one-sixth of the nett proceeds of the crops, yet these annual payments were expressly stipulated, " to be made out of one-half part of the nett proceeds of the said plantation which will belong to the said *Humphreys*." The partnership was declared to exist between *Brown* and *Humphreys*, as equal owners of the plantation and slaves. If the partnership had made no profits whatever, *Humphreys* was bound absolutely, and without reference to the state of the partnership account, to pay the $18,000 at the end of four years.

The decree of the court below in sustaining the claim of the plaintiffs has, we believe, fulfilled the intention of the testator.

*Judgment affirmed.*