ROLAND L. BELSOME, Judge.
| lAIthough Josephine Newcomb signed her last will and testament over a century ago, it is the content of that document that creates the issue before this Court. When cases, such as this one, generate great passion amongst the interested parties, that emotion can sometimes veil the real issue. Here we are only presented with one sobering question: was the trial court correct in its finding that Mrs. Newcomb’s will created an unconditional bequest to the Administrators of the Tulane Educational Fund? That answer must be yes.
The H. Sophie Newcomb Memorial College was created as a memorial to Mrs. Newcomb’s deceased daughter. In 1886, Mrs. Newcomb donated $100,000 to Tulane University for the sole purpose of the Board establishing Newcomb College for the higher education of females. Dui’ing this time period, there were no females enrolled in Tulane’s undergraduate programs. Mrs. Newcomb continued to donate monies to Tulane for Newcomb College until her death on April 7,1901.
At the time of her death, Mrs. Newcomb had an olographic will dated May 12, 1898, in which she named Tulane as her universal legatee. As the universal [2legatee Tulane inherited approximately $2,668,409.00. Following Mrs. Newcomb’s death, Tulane continued to operate Newcomb as a separate women’s college. Newcomb College evolved over the century following Mrs. Newcomb’s death. Many of these changes involved the merging of classes, faculty, and currículums with Tulane’s undergraduate programs. Although it remained a separate college within its University, Newcomb was not separately accredited and did not have independent degree granting authority.
Following the aftermath of Hurricane Katrina, Tulane, like many other institutions, was forced to alter its course of operation in an effort to maintain its existence. Those efforts resulted in Tulane’s development and implementation of the “Renewal Plan”. A major component of the Plan was the merger of Newcomb College and other separate colleges into one undergraduate college, Newcomb-Tulane College.
It was that organizational change that was challenged in Howard v. Administrators of the Tulane Educational Fund, 06-1276 (La.App. 4 Cir. 10/22/07), 970 So.2d 21, rev’d in part, vacated in part, 07-2224 (La.7/1/08), 986 So.2d 47. The Howard plaintiffs sought a permanent injunction ordering Tulane to resume the operations of Newcomb College in the manner in which it was in existence prior to Hurricane Katrina. Id. The merits of the Howard case were identical to the instant case. In Howard, the district court judge determined that Mrs. Newcomb unconditionally bequeathed her estate to Tulane. Id. Upon review by this Court, that ruling was affirmed with one judge dissenting. Id. A writ was |3applied for and granted by the Supreme Court. Id. The Supreme Court did not address the merits of the Howard case, but instead, vacated this Court’s judgment on a finding that the Howard plaintiffs had not properly established their successorship to Mrs. Newcomb. Id.
Subsequent to the Supreme Court’s ruling in Howard, Susan Henderson Montgomery filed a Petition for Declaratory Judgment and to Enforce Condition and/or Charge. Like the Howard plaintiffs, Ms. Montgomery seeks to have Newcomb College return to the operating status of July, 2005. The basis for Ms. Montgomery’s *62 petition was that Mrs. Newcomb’s inter vivos and mortis causa donations to Tulane were subject to a condition and/or charge that required Tulane to maintain and operate Newcomb College as a separate degree granting institution.
On May 27, 2009, Ms. Montgomery filed a motion for summary judgment. Tulane responded with a cross-motion for summary judgment arguing that the Newcomb will did not impose any condition and/or charge on the legacy. The trial court heard arguments and rendered judgment on August 28, 2009. The judgment denied Ms. Montgomery’s motion for summary judgment while granting Tulane’s cross-motion for summary judgment. This appeal followed.
The correctness of the trial court’s determination to grant the cross-motion for summary judgment is subject to de novo review.
|4In support of its ruling, the trial court’s reasons for judgment found that the language preceding Mrs. Newcomb’s bequests in her will contained precatory language. The passage reads:
I have implicit confidence that the “Administrators of the Tulane Educational Fund” will continue to use and apply the benefactions, and property, I have bestowed and may give, for the present and future development of this Department of the University Known as the H. Sophie Newcomb Memorial College which engrosses my thoughts and purposes, and is endeared to me by such hallowed associations.
Upon its finding that the language was precatory, opposed to dispositive, the trial court ruled that Tulane’s obligation to maintain Newcomb College arose out of a sense of duty and gratitude, not a condition and/or charge created by the language of the will. “Precatory words are mere wishes and suggestions, which are not binding in law.” Succession of Baker, 432 So.2d 817 La. 5/23/83) (citing Succession of Barry, 250 La. 435, 196 So.2d 265 (1967) and Succession of Maguire, 228 La. 1096, 85 So.2d 4 (1955)); also see Black’s Law Dictionary 1214 (8th ed.2004). We agree with the trial court’s interpretation of the language in the paragraph, and specifically find that the phrase “I have implicit confidence” is used to advise not direct.
Additionally, a reading of the actual bequest also supports the trial court’s ruling. The bequest to Tulane in Mrs. Newcomb’s final executed Last Will and Testament dated May 12,1898 reads:
Third: With the exception of the Special legacies and bequests herein above stated and made, I hereby give and bequeath to the “Administrators of the Tulane Educational Fund” of New Orleans, the whole of the property real, personal, and mixed, of which I am now possessed or which I may leave at the time of my death, and to that end and purpose I do hereby name and ^constitute the said “Administrators of the Tulane Educational Fund” to be my universal legatee.
Addressing this exact issue in Hutchinson v. Tulane University of Louisiana, 171 La. 653, 131 So. 838 (1930), the Supreme Court identified the vested rights given in an unconditional bequest as separate and distinct from suggestive and advisory language written in subsequent paragraphs of the will.
In Hutchinson, the plaintiffs filed suit to recover the legacy to Tulane University on the grounds that the legacy had lapsed because Tulane University had not fulfilled that conditions imposed by Hutchinson in his will. Id. Much like the case before this Court, the testator, Alexander Hutchinson, had named Tulane University as his universal legatee providing that the legacy be *63 for the sole and exclusive benefit of its Medical Department. Id. In subsequent paragraphs, Hutchinson discussed how he “contemplated”, “recommended” and would “request” the legacy be used by the Medical Department. Id. The Supreme Court found that the bequest made in the first paragraph was an unconditional gift that vested title in the university and that the succeeding paragraphs did not create conditions but rather provided “advisory directions regarding the use of the property.” Id.
The identical circumstances exist in the instant case; the will bequeaths upon Tulane an unconditional gift. Tulane has vested title in the property; and phrases made declaring Mrs. Newcomb’s mere wishes or desires for the use of the money do not create a condition on the actual bequest. There is clearly no condition within the will nor or there any ambiguities to allow extrinsic evidence to enter the | ^lawful parameter of our review. This Court cannot take it upon itself to rewrite Mrs. Newcomb’s will in order to achieve a desired result.
The Plaintiff urges this Court to consider the intent and charges placed upon Mrs. Newcomb’s inter vivos donations to Tulane when interpreting her mortis causa donation. However, the clarity of the will limits our review to the four corners of the document and we are prohibited from delving further. The extraneous information presented by Ms. Montgomery in support of her position cannot be considered when the unambiguous nature of the will has been acknowledged. Matter of Succession of Williams, 608 So.2d 973, 975 (La.1992); La. C.C. art. 1611(A). More specifically, La. C.C. art. 1611(A) states in pertinent part: “[t]he intent of the testator controls the interpretation of his testament. If the language of the testament is clear, its letter is not to be disregarded under the pretext of pursuing its spirit.” Id.
“When the words of the testament are plain and unambiguous, the testator’s intent should be ascertained from the language used in the testament, giving the words used their usual significance.” Der-ouen v. Derouen, 03-0623, p. 3 (La.App. 3 Cir. 1/28/04), 865 So.2d 940, 942 (citing Succession of Vatter, 192 La. 657, 188 So. 732 (1939)). As the record indicates, Mrs. Newcomb conferred with her attorney and spent some time finalizing her will, including redacting more specific and restrictive language to ensure that Tulane would be the beneficiary of her donations without interference from any would-be heirs. Mrs. Newcomb’s actions 17are documented and reveal that she purposefully and knowingly removed any and all conditions on Tulane’s legacy.
Accordingly, we are bound by the explicit language of the will and must therefore affirm the trial court’s findings.
AFFIRMED.
BAGNERIS, J., dissents for the reasons assigned by Judge TOBIAS.
TOBIAS, J., dissents and assigns reasons.
TOBIAS, J.,
dissents and assigns reasons.
hThe majority opinion only tells part of the story relating to the last will and testament of Josephine Louise LeMonnier Newcomb. My dissent tells the rest of the story, which the majority chooses not to discuss, thereby, in my opinion, erring as matter of law and fact and reaching an erroneous conclusion.
Josephine Louise LeMonnier Newcomb had a daughter, Harriott Sophie New-comb, who died in 1870. In memory of her daughter, by letter dated 11 October 1886 *64 to the Board of Administrators of the Tulane Educational Fund[1] (hereinafter occasionally referred to as the “Tulane Board”) doing business as the Tulane University of Louisiana (“Tulane”), Mrs. Newcomb established the H. Sophie Newcomb Memorial College (hereinafter frequently referred to as “Newcomb College”) for women at Tulane University; accompanying the letter was an inter vivos donation of $100,000. The letter read in pertinent part as follows:
| ¾1 request that you will see that the tendency of the institution shall be in harmony with fundamental principles of the Christian religion, and to that end, that you will have a Chapel or assembly room in which Christian worship may be observed daily for the benefit of the students. But I desire that the worship and instruction shall not be of a sectarian or denominational character. I further request that the education given shall look to the practical side of life, as well as to literacy excellence. But I do not mean in this my act of donation to impose upon you restrictions which will allow the intervention of any person or persons to control, regulate or interfere with your disposition of this fund, which is committed fully and solely to your care and discretion with entire confidence in your fidelity and wisdom.
In pursuance of a long cherished design to establish an appropriate memorial of my beloved daughter H. Sophie Newcomb, deceased, I have determined ... to entrust to your Board the Execution of my design.
Feeling a deep personal sympathy with the people of New Orleans, and a strong desire to advance the cause of female education in Louisiana, and believing also that I shall find in the Board selected by the benevolent Paul Tulane, the wisest and safest custodian of the fund I propose to give, I hereby donate to your Board the sum of One Hundred Thousand Dollars to be used in establishing the H. Sophie Newcomb Memorial College in the Tulane University of Louisiana for the higher education of white girls and young women.... ” [Emphasis of underline in original; emphasis of boldface added.]
A letter of that same date sent to the President of Tulane University states in pertinent part:
In accordance with the enclosed letter of donation to the Administrators of the Tulane Education fund, which please forward to them, and for the purpose of fully carrying out my wishes as herein Expressed, I now Enclose you my check ... for the sum of One Hundred Thousand dollars ($100,000) and which is to be applied ... for establishing, and maintaining “The H. Sophie Newcomb Memorial College ” in the “Tulane University of Louisiana”, for the higher education of white girls and young white women. [Emphasis of underlining in original; emphasis of boldface added.]
|sAt a meeting of the Tulane’s Board of directors on 9 November 1886, the following resolution was adopted:
Resolved, that the Administrators of the Tulane Educational Fund accept the gift of One Hundred Thousand Dollars ($100,000) made to them by Mrs. Josephine Louise Newcomb for the purpose of establishing the H. Sophie Newcomb Memorial College in the Tulane University of Louisiana for *65 the higher education of white girls and young women.
Be it further resolved that the gift is accepted under the terms and conditions Expressed in the letter of Mrs. Josephine Louise Newcomb, addressed to the Tulane Educational Fund on the Eleventh of October, Eighteen Hundred and Eighty-Six.
Be it further resolved, that not only the foregoing letter of Mrs. Josephine Louise Newcomb, but also the letter by her addressed to Colonel Wm Preston Johnston [President of Tulane] of the Eleventh of October, Eighteen hundred and Eighty-Six, be read in the minutes of the Board and the originals be preserved among its archives.
Be it further resolved that the Administrators of the Tulane Educational Fund will carry out with fidelity and to the best of their ability the wishes and plans of the donor of this sacred and munificent gift.
Be it further resolved, that this Board accepts the gift not only with a profound sense of gratitude to Mrs. Newcomb, but also with deep conviction as to the wisdom and utility of the good work founded by her. That in undertaking the high duties which the donation imposes, the members of this Board trust that with the aid of Divine Providence they will be able to perform them as to fully realize the noble purposes of Mrs. New-comb — the opening to young women of a higher sphere of culture and usefulness in life. [Emphasis of underlining in original; emphasis of boldface added.]
From the time of the $100,000 donation until her death, Mrs. Newcomb donated an additional $858,142 to Tulane for maintaining the H. Sophie Newcomb Memorial College. With these funds, Tulane purchased real estate for Newcomb ]4 College, started a library for Newcomb College, acquired equipment for Newcomb College, constructed fences and walkways around the Newcomb College properties, built structures for Newcomb College, and endowed a general fund for Newcomb College.
Mrs. Newcomb died on 7 April 1901. Under her probated last will and testament written in 1898, she left Tulane $2,668,410 as a universal bequest; her testament read in pertinent part:
FIRST, I have resided of late years in different places but have made the City of New Orleans my permanent home, because I here witness and enjoy the growth of the “H. Sophie Newcomb Memorial College,” a Department of the Tulane University of Louisiana,[2] which I have founded, and has been named in honor of the memory of my beloved daughter.
I have implicit confidence that the “Administrators of the Tulane Educational Fund” will continue to use and apply the benefactions and property, I have bestowed and may give, for the present and future development of this Department of the University known as the “H. Sophie Newcomb Memorial College”[3] which engrosses my thoughts *66 and purposes, and is endeared to me by such hallowed associations. [Emphasis added.]
In her succession, Tulane’s Board accepted the universal bequest “purely and simply under all the conditions and limitations therein imposed, and for the purposes therein expressed.”
| sUnlike as in Howard v. Administrators of the Tulane Educational Fund, 06-1276 (La.App. 4 Cir. 10/22/07), 970 So.2d 21, rev’d in part, vacated in part, 07-2224 (La.7/1/08), 986 So.2d 47, we have before us evidence of communications between Mrs. Newcomb and her attorney, James McConnell, who assisted in the preparation of her last will and testament. Mr. McConnell was a New Orleans lawyer who, at the time of the events leading up to and the preparation of Mrs. Newcomb’s 1898 testament, was counsel for the Board of Administrators of the Tulane Educational Fund and one of its officers.[4] In re Newcomb’s Estate, 192 N.Y. 238, 247, 84 N.E. 950, 953 (1908).[5]
In the spring of 1898, Mrs. Newcomb and Mr. McConnell met on multiple occasions to discuss a new will because Mrs. Newcomb was concerned that her relatives, from whom she was estranged, might try to break her 1895 will. Mr. McConnell wrote a first draft of the will with language in a preamble that expressed Mrs. Newcomb’s desires for the H. Sophie Newcomb Memorial College. The draft ended with the language:
With the exception of the Special legacies and bequests herein above stated and made, I hereby give and bequeath to the “Administrators of the Tulane Educational Fund” of New Orleans, the whole of the property real, personal, and mixed, of which I am now possessed or which I may leave at the time of my death, and to that end and purpose I do hereby name and ^constitute the said “Administrators of the Tulane Educational Fund” to be my universal legatee.
Tulane’s Board asserts that the preamble is precatory, which I discuss in greater detail infra. In drafting her olographic will, Mrs. Newcomb wanted to insert after the words “New Orleans” that the bequest was for the sole use and benefit of “H. Sophie Newcomb Memorial College” as was contained in her 1895 will. Mr. McConnell expressed to Mrs. Newcomb that it was his opinion that the language “would have made the bequest a trust and not a fee simple bequest.” (During this period of time, I note that Louisiana law and jurisprudence was hostile to trusts, which were treated as prohibited substitutions by virtue of La. C.C. art. 1520;[6] *67 constitutional amendments were adopted over a series of years to indicate that trusts were allowed in Louisiana, but were met with hostility from Louisiana’s Supreme Court.) He advised that her language would give her heirs at law a grounds for attacking the will and that the property might be subject to taxation if it was held in trust by Tulane.[7] Mrs. New-comb took Mr. McConnell’s suggestions and struck the language. But by doing so, she gave Tulane’s Board an avenue to allege that her bequest contained no restrictions on what the Tulane Board could do 17with the monies previously donated or bequeathed. It is unknown whether Mr. Connell, who had a conflict of interest, i.e., a fiduciary obligation to Tulane by virtue of being on the Board of Administrators, an officer, and its lawyer, and an ethical obligation to Mrs. Newcomb, intentionally advised Mrs. Newcomb as he did in order to create a potential ambiguity in the interpretation of her will, considering her prior donations to Tulane for Newcomb College of almost $1,000,000 or to give Tulane’s Board complete discretion over her bequest without the need for the Tulane Board to be concerned with whether the monies would continue to be used for the Newcomb College.
As discussed infra, the deletion of the language by Mrs. Newcomb described above militates to a conclusion that Mrs. Newcomb intended that her estate go, except for a few special bequests, exclusively for the use and benefit of the Newcomb College and not to be left to the discretion of Tulane’s Board to apply the monies elsewhere as they saw fit. One must consider the whole history of Mrs. Newcomb’s donations, both inter vivos and mortis causa to the Tulane Board.
In 1910, certain Board members suggested that some of the funds that Mrs. Newcomb had donated to Tulane be used for purposes unrelated to Newcomb College. The then President of Newcomb College objected, noting that newer Board members were unaware of the “peculiar Conditions” associated with Mrs. New-comb’s donations and that to use funds for purposes other than Newcomb College “would involve a violation of trust, a view the Board evidently held.”
Additionally, the President of Tulane’s Board expressed his concerns that the use of funds from Mrs. Newcomb for purposes not associated with Newcomb |sCollege would violate Mrs. Newcomb’s donor intent and requested that the Board adopt the policy respecting the funds:
It has been ... suggested that this use of the revenue of the Newcomb fund is violative of the intention of the donor, whose sole object was to create a memorial for women, in which post-graduate work can be done, and that no portion of the revenues of this fund should be used for the education of women beyond the portals of this Women’s Memorial College, to and within which should be confined the entire educational outlay. [Emphasis added.]
And so it came to pass that thereafter, until the events leading up to the subject of this lawsuit, the Board used Mrs. New- *68 comb’s funds exclusively for Newcomb College.

A Brief Statutory History of Tulane University of Louisiana

Tulane University has been acknowledged and recognized in Louisiana’s constitutions. It is the successor to the University of Louisiana that was recognized and provided for in the Louisiana’s Constitution of 1845 (arts. 137[8] through 139), the Constitution of 1852 (arts. 139 and 140), the Constitution of 1864 (art. 143[9]), and the Constitution of 1868 (art. 142[10]). The Louisiana Constitution of 1879 (art. 1 a230) mandated that the legislature finance the University of Louisiana with not more than $10,000 annually. Beginning with the Louisiana Constitution of 1898 (arts. 230 and 255), Tulane University of Louisiana was specifically recognized by name and Louisiana Acts 1884, No. 43, was made a part of the Constitution. Article 256 of the 1913 Constitution continued essentially the identical language of the 1898 Constitution, as did Louisiana’s 1921 Constitution, art. XII, § 24. In its present version, the 1974 Louisiana Constitution art. VIII, § 14 states: “The Tulane University of Louisiana in New Orleans is recognized as created and to be developed in accordance with Act No. 43 approved July 5, 1884.” (The entirety of La. Acts 1884, No. 43 is set forth in attached Appendix A.)[11]
The Louisiana Supreme Court has explained Act 43 in part:
By the provisions of Act No. 43 of 1884, which was adopted as a constitu *69 tional amendment, ... property ... was placed under the “direction, control, and administration” of the Administrators of the Tulane 1 ^Educational Fund and was listed in the inventory taken on August 2, 1884.... One of the conditions attached to the property inventoried and transferred was that “the property, so transferred, may not be sold or disposed of, except under Legislative sanction.” Section 2, Act No. 43 of 1884.
City of New Orleans v. Administrators of the Tulane Educational Fund, 193 La. 297, 299,190 So. 560 (La.1939).
The purpose of the reference to Tulane University, in each of the three Constitutions adopted after the amendment of the Constitution of 1879 pursuant to Act No. 43 of 1884, was to recognize that the constitutional amendment, according to Act No. 43 of 1884, was an irrevocable contract between the state of Louisiana and the Board of Administrators of the Tulane Education Fund. It is so declared in the seventh section of Act No. 43 of 1884, viz.:
That this act, in all its provisions, be and the same is hereby declared to be a contract between the State of Louisiana and the Administrators of the “Tulane Education Fund,” irrevocably vesting the said Administrators of the “Tulane Education Fund,” with the powers, franchises, rights, immunities and exemptions herein enumerated and hereby granted, and irrevocably binding said administrators to develop, foster and maintain as above provided, the University as aforesaid in the city of New Orleans, subject to and in accordance with the terms of this act.
Ex parte Steckler, 179 La. 410, 417, 154 So. 41, 43 (1934).
In State v. Board of Administrators of Tulane Education Fund, 112 La. 432, 51 So. 483 (1910), the Court set out a further history of Tulane University summarized as follows:
In the year 1882, Paul Tulane expressed to certain citizens of Louisiana his intention to donate real estate belonging to him in New Orleans for the purpose of fostering higher education in the state. Certain Louisiana citizens thereafter | ¶ j organized themselves into a corporation, under the name of the “Administrators of the Tulane Education Fund,” [12] and Paul Tulane donated to them nearly $1,000,000, the revenues therefrom to be used for the promotion and encouragement of intellectual, moral, and industrial education.
In 1884, the Tulane Board made known to the Louisiana Legislature their desire to take charge of the University of Louisiana, a state institution, and to devote the revenues of the property then owned or thereafter to be owned by Tulane’s Board to the expansion and development of the University of Louisiana; upon the adoption of a constitutional amendment, Tulane’s Board would apply all the revenues of property then owned or thereafter to be acquired by them to the creation and development in New Orleans of a university.
The Louisiana Legislature and the Tulane Board negotiated, the result of which was the enactment of Act 43 of 1884, that was subsequently adopted as a constitutional amendment, because of the doubt of the power of the legislature to transfer to Tulane’s Board all the rights, privileges, and property of the University of Louisiana and to exempt all the property of the Tulane Board from taxation.
The act was declared to be a contract between the state of Louisiana and the Administrators of the Tulane Educational *70 Fund, irrevocably vesting the administrators with the powers, franchises, rights, immunities, and exemptions therein enumerated and thereby granted, and irrevocably binding the administrators to develop, foster, and maintain the university.
The Tulane Board, however, agreed and bound themselves “to waive all legal claim upon the state of Louisiana for any appropriation, as provided in the Constitution of the state, in favor of the University of Louisiana.” (As noted 112above, article 230 of the Constitution of 1879 established a duty on the legislature to make provision for the support of the University of Louisiana, not to exceed $10,000 annually.)
Tulane’s Board further agreed to give continuously in the academic department free tuition to one student from each senatorial and each representative district or parish to be nominated by its member in the legislature. Under this provision free tuition was perpetually assured to more than 100 Louisiana youths without cost to the public.
It is manifest on the face of Act No. 43 of 1884 that the state was contracting with a private corporation organized by notarial act under the general laws of the state. In the argument of the case the Attorney General admitted that the ‘Administrators of the Tulane Education Fund’ is not a state institution. It cannot be otherwise under the facts of the case and the provisions of said statute. The General Assembly recognized the Board as a private corporation capable of making a perpetual and irrevocable contract with the state of Louisiana. The act of 1884 expressly repealed section 1366 of the Revised Statutes of 1870, giving the Legislature power of supervision and control over the University of Louisiana. It goes without saying that the Legislature cannot make such a contract with a state institution or renounce its powers of supervision and control over a state agency.
Section 2 of the act declares that the Board shall have full direction, control, and administration ‘of all the property belonging to the state of Louisiana, and now dedicated to or used by the University of Louisiana, as well as all property controlled or used by the said University of Louisiana.’ It was directed that the Board of Administrators of the University of Louisiana turn over to the Board of Administrators of the Tulane Education Fund all the property, rights, books, papers, and archives now under their administration or control. And it was further enacted as follows:
An inventory shall be made of all the property, movable and immovable, belonging to the University of Louisiana, and transferred by this act to the control and administration of the Administrators of the 11HTuIane Education Fund, by two appraisers to be appointed for that purpose by the Governor of the state and sworn, which appraisement shall be filed in the office of the Secretary of State, as evidencing the description and appraised value of the property so transferred, and also in order that the liability of the said Administrators of the Tulane Education Fund may not be extended beyond the return of the property, so transferred, in any contingency; provided further, that the property, so transferred, may not be sold or disposed of except under legislative sanction; provided further that if the ‘Tulane University of Louisiana’ as herein established, should cease to use the property, and exercise the privileges, franchises and immunities, now under the control and administration of, and enjoyed by the University of Louisiana as now constituted and *71 transferred by this act, for the exclusive purposes intended by this act, then and in that event, the state of Louisiana shall have the right to resume the custody, control and administration of said property, and the exercise of said privileges, franchises and immunities.’ [Sic]
The only right of action conferred by the act on the state of Louisiana under said legislative contract is set forth in the foregoing provisions, and the only liability of the Board is restricted to the return of the property to the state in the event the Board should fail to carry out its part of the agreement. If the Board has unlawfully disposed of the property without legislative sanction, the right of the state of Louisiana, if any, is to sue directly to annul the contract and recover the property for the state.
State v. Board of Administrators of the Tulane Education Fund, 125 La. at 449-451, 51 So. at 489-490.
The Louisiana Constitutional Convention of 1973 debated whether Tulane University of Louisiana should be mentioned in the new constitution. The draft 114proposed by the committee considering the matter read verbatim: “The Tulane University of Louisiana in New Orleans is recognized as created and to be developed in accordance with Act No. 43 approved July 5, 1884.” In response to the proposed amendment to delete the provision in its entirety, various delegates spoke. Delegate Sutherland noted that the Tulane administrators (Board) “did not want to be in the constitution.” La. Const. Conv., Transcripts, Vol. 9, p. 2439. Delegate Juneau noted that Tulane no longer needed the provision because it had existed only because of some long expired contracts. Id. Delegate Den-nery stated:
Mr. Chairman and delegates, since it was mentioned that my ... a statement was made by me — it was repeated at the committee when this came up — I would like to clarify the situation. I have talked to the people at Tulane. They do not want formally to argue one way or the other, as far as this is concerned. They would like ... they asked me to please point out to the delegates, as was mentioned by Senator De Blieux, that Act 43 of 1884 does provide for the legislative scholarships. Based upon that act, there is a contract between the State of Louisiana and Tulane University which created Tulane University of Louisiana. It was an amalgamation at that time of the old University of Louisiana, which was a medical school in New Orleans, and the Tulane University, which had been founded by the bequest of Paul Tulane. This provision has been in the constitution since 1921. Unless there is a reason to delete it, I would see no reason to adopt the amendment proposed by Mr. Tobias. I don’t know that there is a reason to delete it, but I don’t think it makes a heck of a lot of difference one way or another, since we do have a situation where there is a contract between the university and the State of Louisiana. I would be glad to yield to any questions.

Id.

Various other delegates, however, became concerned with whether the deletion might abolish the contractually mandated 144 free scholarships provided by Tulane to senators and representatives for youths of Louisiana, in spite of the prohibition contained in the United States constitution of laws retroactively | ^affecting contracts and the prohibition in the call for the constitutional convention specifically prohibiting the delegates from enacting any law that impaired the obligation of an existing contract. Id.
*72 Delegate Hayes directed a question to Delegate DeBlieux (then a state senator) whether the proposed language constituted “aid to private schools in any way?” The questions and answers read as follows:
Mr. DeBlieux Well, no, I kind of feel like Tulane is a little bit kind of public. I feel like even though it is considered a private school, I think it’s public property. [... ]
Mr. Hayes Well, then, you’re ruling then that it is not ... Tulane is not a private school; you’re saying it’s kind of public.
Mr. DeBlieux It’s privately endowed.
Mr. Hayes So, any other school like Tulane that would ... you could classify like this could get this aid, you’re saying. Students could use this type scholarship to go to other schools ...
Mr. DeBlieux We made a little contribution to them last year in getting them to take in about seventy of our medical students.
Id. at p. 2440. [Emphasis added].
Further discussion ensued:
[[Image here]]
Mr. Mauberret Isn’t it a fact that they get five million dollars of free assessments in the parish of Orleans for these hundred and forty-four scholarships, other than school properties.
* * *
Mr. Jack Mr. Chairman and members, this is a serious thing, like the Speaker said here — the Chairman. Apparently, most of you don’t know the situation. Back in 1880, they wanted to create Tulane University. This land down there, part of it was owned by the state, which | ic,as I recall — ... was the University of Louisiana. They passed these laws, and the city of New Orleans, as I recall reading in the old dark statutes, so that they would deed this land to this Board of Supervisors — some such thing created by Paul Tulane’s will and that started Tulane University. Now, in consideration of doing that forever and eternally, each member of the Louisiana Legislature would receive one scholarship to Tulane. They later made that scholarship could be used at New-comb. That’s a hundred and forty-four girls and boys in Louisiana continuously can have a scholarship to Newcomb or Tulane.... By leaving it out, it might be construed that we no longer want to hold Tulane or New-comb to that agreement they made. Now as to those talking about getting out of taxes, no college that’s a nonprofit college — which none of them are — has to pay taxes on land anyway. So we, got the best of that deal. When Dr. Harris was president of Tulane — I had gone to the law school there when he was dean — it looked like at that time it might be unfair to keep holding them. I asked him. Much to my surprise he said, “Wellborn, we like that because it makes it possible to have students at Newcomb and Tulane from all parishes in the state, and it does not cost a lot to go to Tulane or Newcomb....["]
[[Image here]]
Mr. Pugh Well, do you know whether or not Tulane is ¿ private foundation.
Mr. Vick It’s a private institution, Mr. Pugh. I think that’s a matter of public record; it’s not state supported.
Mr. Pugh No, sir. I had reference to a private foundation to determine whether or not we have already created a tax exemption for it; that’s all.
Mr. Lanier Mr. Vick, if we follow the rationale of the opponents to this amendment that we’ve got to keep this *73 in here in order to protect these scholarships, would it, therefore, have to follow that, if and when we write the constitution of the year 2200, we’re going to have to ratify and incorporate by reference this act of 1884.
Mr. Vick In perpetuity, there’s no doubt.
Mr. Lanier We could never get it out of any constitution, at any time?
_[i7Mr. Vick Never, it’s indelible.
Mr. Lanier Do you really believe that’s the law, Mr. Vick?
Mr. Vick Never.
⅝ ⅝ 5¡S
Mr. Flory Mr. Vick, everybody’s talking about scholarships to Tulane. Isn’t it true that the legislature doesn’t get scholarships to state institutions?
Mr. Vick Not that I know of, Mr. Flory.
Mr. Flory Didn’t the legislature abolish the program of scholarships to state colleges and universities?
Mr. Vick Yes. I think they did that some years ago.
Id., pp. 2440-42. [Emphasis supplied.]

Recent Newcomb College History

In the early 1960s, Newcomb College classes and classes of the College of Arts and Sciences (“Arts and Sciences”) of Tulane University were racially integrated. By 1969, most of Newcomb College’s departments [13] had been unified under a single chairperson. By 1976, co-educational housing was initiated at Newcomb College. In 1979, the faculties of Newcomb College and Tulane’s College of Arts and Sciences created a single undergraduate curriculum. The undergraduate admissions of Tulane University and Newcomb College were consolidated in 1983. A uniform code of conduct for students was adopted in 1985.
On 19 November 1987, the Tulane Board adopted a series of resolutions that positively reaffirmed “Newcomb College as Tulane’s coordinate college for the Illiberal arts education of women.” [Emphasis supplied.] By resolutions of the Tulane Board on 30 June 1988, the New-comb Foundation was created to accommodate Newcomb College’s needs for financial resources. Later that same year, the Tulane Board dedicated $2,000,000 of Tulane’s funds as an endowment to the New-comb Foundation. Also, the 30 June 1988 resolutions and resolutions of 16 March 2006 dedicated “in perpetuity as the New-comb College Campus, the area generally bounded by Broadway, Zimple Street, Newcomb Place and Plum Street, the building thereon, the Newcomb Dean’s House, Warren House, and Caroline Richardson Hall.”
By resolutions of 16 May 1996, the Tulane Board:
RESOLVED, that the Board of Administrators hereby affirms its recognition of its unique and historic mission of Newcomb College to educate women and its commitment to preserve the fundamental spirit and special qualities that distinguished it during its 100-year history.
RESOLVED, That in order for the College to continue to create new opportunities to attain an even greater degree of distinction and excellence in fulfillment of its historic and valuable mission, the Board of Administrators hereby dedicate $11,919,031 of available and otherwise unrestricted funds functioning as endowment for Newcomb purposes, effective July 1,1996.
*74 RESOLVED further, That the spendable income from said funds functioning as endowment will be used in its entirety to offset partially the operating budget of Newcomb College, rather than used for general university support or enhancement of programs in Newcomb College. [Emphasis added.]
| ^Contrary to what the majority states, Newcomb had always issued to its graduates separate college degrees indicating that the individual had graduated from H. Sophie Newcomb Memorial College, not Tulane. No requirement existed that mandated that Tulane had to issue a degree to a Newcomb graduate.
Thus, from 1886 until August 2005, Newcomb College had its own name, its own separate dean, its own separate degrees, its own separate diplomas showing that one had graduated from H. Sophie Newcomb Memorial College, its own separate graduates, its own separate advisors, its own separate campus, its own separate student body, its own separate senate, and its own separate programs designed to benefit women.
Hurricane Katrina struck New Orleans on 29 August 2005 and caused extensive damage. In response to the damage occasioned, Tulane adopted its so-called “Plan for Renewal” that, among other things, suspended further admissions to Newcomb College. Thus, no students were admitted to Newcomb College for the Fall semester of 2006 or thereafter. Tulane’s Board closed Newcomb College and created the “H. Sophie Newcomb Memorial College Institute,” which is not a separate coordinate college for women and has no academic standing. In place of Newcomb College is the Newcomb-Tulane liberal arts college for men and women.

The History of this Litigation and its Related Predecessor Lawsuit.

In 2006, Parma Matthis Howard and Jane Matthis Smith, descendant’s of Mrs. Newcomb filed suit, seeking preliminary and permanent injunctions, and a declaratory judgment ordering the Tulane Board to carry out what they alleged was a specific condition of Mrs. Newcomb’s original $100,000 inter vivos donation and 1 ¡^subsequent testamentary bequest: to maintain H. Sophie Newcomb Memorial College as a separate college for women within Tulane University in memory of H. Sophie Newcomb. In response, Tulane filed exceptions of prescription, res judica-ta, no right of action, and no cause of action. The trial court sustained Tulane’s exception of no right of action. On review, this court in a 2-1 decision affirmed. Howard v. Administrators of the Tulane Educational Fund, 06-1276 (La.App. 4 Cir. 10/22/07), 970 So.2d 21. Embracing the dissent in this court, the Louisiana Supreme Court reversed and stated that
the right of revocation belongs to the donor and his successors, including those who would benefit from the revocation, i.e., would-be heirs and legatees, and that in conjunction with the right to sue for revocation of a donation for nonperformance of a condition is the corollary right to sue for enforcement of that condition. Therefore, our law recognizes the right of would-be heirs to seek enforcement of a conditional donation. However, the plaintiffs [Ms. Howard and Ms. Smith] in their pleadings do not establish their status as Mrs. New-comb’s would-be heirs. Accordingly, we vacate the judgment of the court of appeal, sustain the exception of no right of action, and remand this matter to the district court to allow the plaintiffs to amend their petition to more accurately establish their standing as successors, or would-be heirs, of Mrs. Newcomb. [Footnote omitted.]
Howard v. Administrators of the Tulane Educational Fund, 07-2224, pp. 18-19 (La.7/1/08), 986 So.2d 47, 60-61.
*75 Thereafter, on 20 August 2008, Susan Henderson Montgomery, the great-great-great niece of Mrs. Newcomb filed a new suit seeking declaratory relief and enforcement of the conditions and charges that Mrs. Newcomb placed on Tulane’s Board by virtue of the donations inter vivos and mortis causa, to-wit, that the Tulane Board reopen and operate the H. Sophie Newcomb Memorial College in “the same manner and condition as it was so operated in July, 2005, and to restore |g1[H. Sophie] Newcomb [Memorial] College endowments to their previous purpose.”[14]
No dispute exists that Ms. Montgomery has a right of action to seek relief by virtue of the Louisiana Supreme Court’s decision in Howard, supra.

Discussion

The issue now before this court is whether the trial court erred in ruling on cross motions for summary judgment that denied Ms. Montgomery’s motion and granted Tulane’s motion that “Mrs. New-comb’s will contains no enforceable conditional obligation to support plaintiffs claim.” I do not interpret the issue as narrowly as the Tulane Board does as discussed infra. The trial court dismissed Ms. Montgomery’s petition for declaratory judgment with prejudice.
An appellate court reviews the trial court’s decision de novo. La. C.C.P. art. 966; Hines v. Garrett, 04-0806, p. 1 (La.6/25/04), 876 So.2d 764, 765; Potter v. First Federal Savings & Loan Ass’n of Scotlandville, 615 So.2d 818, 325 (La.1993). The appellate court must not give any deference whatsoever to the ruling of the trial court; the appellate court must determine all issues on the cross motions for summary and the attachments thereto. Article 966 provides that while the burden of proving entitlement to summary judgment rests with the mover, if the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover’s burden on the motion does not require him/her/it to negate all essential facts of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of [ ¡.¿factual support for one or more elements essential to the adverse party’s claim, action or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. Hardy v. Bowie, 98-2821 (La.9/8/99), 744 So.2d 606. A fact is “material” if it potentially ensures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of a legal dispute. Smith v. Our Lady of the Lake Hasp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730. A genuine issue is one on which reasonable persons could disagree. Id. Thus, it is only when, based upon the evidence presented, reasonable persons could reach but one conclusion that summary judgment is appropriate. Id.
In Louisiana, the intent of the donor making a donation is the single most important guideline in the interpretation of a document, and when ascertained, must be enforced, when not violative of law. Succession of Blakemore, 43 La. Ann. 845, 850, 9 So. 496, 497 (1891). Moreover, the intent of the donor must be ascertained from the whole document(s) establishing the donation(s) with effect given to every part of the document(s) as the law permits. *76 Succession of Logan, 884 So.2d 830, 832 (La.App. 4th Cir.1980).
No difference exists in the rules for interpreting the intent of a donor for a donation inter vivos or a donation mortis causa. The only non-arguable difference is that for a donation mortis causa, the donor is dead and not capable of being questioned. For a donation inter vivos, if the donor is still alive, the donor might be questioned as to his/her intent for the donation. Thus it is that descendents of a donor have a right to seek enforcement of the terms and conditions of a ^predecessor's donation. Howard v. Administrators of the Tulane Educational Fund, 07-2224 (La.7/1/08), 986 So.2d 47.
When interpreting a testament and concomitantly a document making any donation, Louisiana courts are guided by La. C.C. arts. 1611-1616. In the case at bar, La. C.C. arts. 1611 and 1612 are relevant. La. C.C. art. 1611 provides, in pertinent part:
A. The intent of the testator controls the interpretation of his testament. If the language of the testament is clear, its letter is not to be disregarded under the pretext of pursuing its spirit. The following rules for interpretation apply only when the testator’s intent cannot be ascertained from the language of the testament. In applying these rules, the court may be aided by any competent evidence.
Further, La. C.C. art. 1612 provides:
A disposition should be interpreted in a sense in which it can have effect, rather than in one in which it can have none.[15]
“[T]he function of the courts is to carry out the intention of the testator” and to give effect to all language contained in the will if possible. Succession of Bel, 377 So.2d 1380, 1383 (La.App. 4th Cir.1980), citing Succession of Stewart, 301 So.2d 872, 877 (La.1974). See also Giroir v. Dumesnil, 248 La. 1037, 184 So.2d 1 (1966). In doing so, if the testament (or document) is ambiguous with regard to a | ^particular clause or bequest, other clauses or bequests are considered to reach an interpretation that harmonizes the provisions therein. Succession of Meeks, 609 So.2d 1035, 1037 (La.App. 2nd Cir.1992), citing Succession of Killingsworth, 292 So.2d 536 (La.1973). Thus, what is stated in one part of the document or testament may be called upon to explain what is meant in an unclear part. Succession of Montegut, 430 So.2d 1024, 1026 (La.App. 5th Cir.1982). Further, when an ambiguity exists as to the donor’s intent, the court not only may, but rather, must consider “any [and all] competent evidence.” La. C.C. art. 1611(A); see also Succession of Stewart, 301 So.2d 872 (La.1974). This “competent evidence” includes “extrinsic evidence,” which includes acts done by the donor before or after he/she has made the donation. Succession ofEhrenberg, 21 La. Ann. 280, 1869 WL 4358 (1869); Clark v. *77 Preston, 2 La. Ann. 580, 1847 WL 3169 (1847).
Louisiana law mandates the court to implement the donor’s intent; that is, in this case, the court must ensure that Mrs. Newcomb’s multiple donations to the Tulane Board are used to maintain a “women’s higher education college,” not a “women’s institute.”
I find that where the trial court went astray and where the majority of this court now goes astray is in the analysis of Mrs. Newcomb’s intent; both are interpreting only Mrs. Newcomb’s last will and testament rather than analyzing the whole history of her multiple donations from 1886 through her death to the Board of Administrator of the Tulane Educational Fund for the use and benefit of the H. Sophie Newcomb Memorial College. The trial court’s failure to do so wasj^an incorrect interpretation of the law and at the very least clearly wrong. Moreover, the ruling of the trial court is internally inconsistent. On the one hand, the trial court delineated Mrs. Newcomb’s clear intent to establish a women’s higher education college, yet, on the other, determined that Mrs. Newcomb’s donations were not subject to any restrictions or conditional obligations. A reading of the 1886 letters and the 1898 will, both in their entireties, reveals that the condition Mrs. Newcomb placed on her donations, and her sole intent in making them, was that the money be used to maintain a women’s higher education college. The Tulane Board’s decision to abandon Newcomb College, not only violates, but completely ignores, Mrs. Newcomb’s intent — she wanted her money to be used for the “H. Sophie Newcomb Memorial College.” The donations were clearly conditional — conditioned that the monies go for the use of a college to be known as the “H. Sophie Newcomb Memorial College.”
In support of their arguments, the Tulane Board relies substantially on Hutchinson v. Tulane University of Louisiana, 171 La. 653, 131 So. 838 (1930); Girven v. Miller, 219 La. 252, 52 So.2d 843 (1951); Voinche v. Town of Marlcsville, 124 La. 712, 50 So. 662 (1909); and Succession of Maguire, 228 La. 1096, 85 So.2d 4 (1955). I discuss each of these cases in turn.
In Hutchinson, the plaintiffs were the sister and the children of a deceased sister of Mr. Hutchinson, who had died in 1895. They sued to recover the legacy of approximately $1,200,000 left to Tulane University under the decedent’s testament alleging that the legacy has lapsed for the nonful-fillment by Tulane of the conditions imposed by the testator.
Mr. Hutchinson’s will in pertinent part read as follows:
12nAfter the above named gifts and bequests have been paid or provided for ..., I give the balance of my estate, real and personal, to the Tulane University of Louisiana, for the sole and exclusive benefit of its Medical Department; the object of this bequest is to create a fund to be used in increasing the efficiency of the Medical Department of the Tulane University of Louisiana, as a Medical School, and to contribute to its usefulness and beneficence in ministering to the ailments, injuries and other physical infirmities of the suffering and the destitute poor of all races, ages, sexes and nationalities.
In the furtherance of the purpose of this bequest, the fund thus created is to be used by the administrators of the Tulane University, under the direction and supervision of the University’s Medical Faculty for the purchase of ground and erection of suitable buildings in connection with and in the immediate vicinity of the building now designated as the Richardson Memorial, and officially *78 known as the Medical Department of the Tulane University of Louisiana. The aforesaid grounds and buildings to be used in the establishment of a free clinic or dispensary and for a hospital to include in its wards such a number of free beds (also for the destitute poor) as in the judgment of the faculty may be available within the limitations of this fund.
It is contemplated in making this bequest that suitable provision will be made by the faculty and administrators to improve all the opportunities for the study of the nature, prevention and cure of disease by the establishment of clinical and other laboratories as may be available out of this fund and in pursuance of its philanthropic object.
It is also recommended that a part of the fund thus created shall be reserved for investment and interest, in such wise as to insure the maintenance of a free clinic, until such time when this provision may in the judgment of the faculty and administrators be deemed unnecessary. This reserve fund should then be utilized or expended in extending the hospital plans, by creating new departments or new buildings as these may be needed to promote the charitable and educational purpose of the bequest.
I request that in some appropriate manner, the hospital administration will arrange to name the structure contemplated under this bequest after my late wife, Josephine.
_j2jThe plaintiffs asserted that Tulane and its medical faculty neither constructed any “clinic or hospital nor created any funds for such purpose nor constructed any clinical or pathological laboratory, nor established or maintained any beds for the destitute poor, as is specially provided in the will as the fundamental and necessary conditions of the universal bequest.” Id,., 171 La. at 656,131 So. at 838.
The Court held the first quoted paragraph of the will contains an unconditional gift that vested title in the university. The subsequent paragraphs only contained advisory directions regarding the use of the property because the testator used the phrases “it is contemplated,” “I recommend,” and “In furtherance of the purpose of the bequest.” The Court held the first paragraph vested in Tulane title to his bequest, the purpose of which was “to increase the efficiency of the medical department of Tulane University Medical School.” Everything contained in the will thereafter was suggestive of what was the way to further the increase in efficiency. Further, the decedent had no history of gifts to Tulane University Medical School.[16]
In Girven, the decedent, Reverend Gir-ven, left an olographic will that named Reverend Miller as universal legatee to be “administered according to my typed instructions” that were not contained in the will. The plaintiffs, the brother and niece of decedent, filed suit against Reverend Miller to have the will voided because it contains a prohibited substitution and fidei commissum, prohibited by La. C.C. art. 1520 and was not complete within itself, requiring reference to another document which was not in olographic form. At a hearing on an exception |2sof no cause of action, the typewritten instructions referred to in the will were produced. The trial court annulled and set aside the clause in the will bequeathing the property of the testator to Reverend Miller, holding that the disposition was conditional and could not be given effect because the sub *79 stance of the testator’s wish was not expressed in olographic form but only in the typewritten instructions referred to in the testament. The Supreme Court upheld the will’s bequest to Reverend Miller, but found that the language referencing the instructions contained in a separate document were precatory, an expression of merely a wish, and unenforceable.
In Voinche, Mr. Voinche in 1858 had made a donation inter vivos to the town of Marksville of a lot of ground solely on which to build a market. Although the town did construct a building on the lot, it did not use the building continuously for a market and dedicated a portion of the ground for use as a street. The act of donation stated that the declared purpose of the donor was to establish a public market for the benefit of himself and the people of the town, that the building and maintenance of a market was a charge imposed by the donor on the donee, and that the town failed to execute the charge. Mr. Voinche’s heirs sued for the revocation of the donation. The Court held that the word “conditions” is synonymous with the word “charges.” Id., 124 La. at 716, 50 So. at 663. They then held that the plaintiffs stated a cause of action if the town had not used the lot as directed by the donation.
In Succession of Maguire, John Ma-guire, surviving brother of the deceased Miss Agnes T. Maguire brought suit seeking to have certain provisions in the decedent’s will declared invalid. The trial court sustained exceptions of no right or cause of action filed by the trustees named in the will and the executor. The 12t)decedent had left two olographic wills, both of which, after making several bequests, contained identical provisions disposing of her residuary estate as follows:
I give and bequeath all the property of ... which I may die possessed, except that which I shall include in special legacies hereinafter mentioned, to the two persons who shall be respectively the pastor of St. Joseph’s Catholic Church of Baton Rouge, Louisiana, and the pastor of St. Agnes’ Catholic Church of Baton Rouge, Louisiana, at the time of my death, and their respective successors, in trust nevertheless for the use and benefit of young girls as a Loan Fund to be lent to them in order to enable them to fit themselves to earn a living. This is intended as a charitable trust for charitable and educational purposes created to continue in perpetuity under the Constitution and laws of the State of Louisiana. .. .The said trustees shall have unlimited discretion in the selection of the beneficaries [sic] of this trust and in the administration of the property and funds of the trust, with all the rights permitted by law to sell any property at any time belonging to the trust and to reinvest the proceeds thereof, and to lend the capital as well as the income to said beneficiaries as they may see fit. To my cousin Agnes Maguire, now living in South Bend, Indiana, I would like the trustees to give her every month the rent of one of the tenant houses or the equivalent — The trustees to decide the amount.
The cousin, Agnes Maguire, predeceased the testator. Thus, per then La. C.C. art. 1697, now embodied in La. C.C. art. 1589, the cousin inherited nothing and language of the bequest to her became precatory. Article IV, § 16 of the 1921 Louisiana Constitution provided that “No law shall be passed authorizing the creation of substitutions, fidei commissas or trust estates ... and provided further that this prohibition as to trust estates or fidei commissas shall not apply to donations strictly for educational, charitable, religious purposes.” The Supreme Court held that as to the unlimited discretion of the trustees *80 to authorize loans toj^girls who did not have sufficient funds to educate themselves, if the trustees violated that condition, the trustees at that later time could be restrained.
My analysis of these cases is that none ultimately support Tulane’s Board position because, save Voinche, they address only a donation mortis causa in the absence of preceding conditional donations inter vivos by the decedent. Voinche actually supports Mrs. Montgomery’s claims because the Tulane Board is now seeking to use Mrs. Newcomb’s donations for something other than a college for women.
I look to the entire history of Mrs. Newcomb’s donations to Tulane University of Louisiana for the purpose of establishing and maintaining the H. Sophie New-comb Memorial College. It starts with her 11 October 1886 letters, both of which reference her making of a $100,000 donation. It is followed by inter vivos donations totaling $858,142 to Tulane University of Louisiana used for the H. Sophie Newcomb Memorial College. I note that Mrs. Newcomb had a falling out with Tulane’s Board along the way. But their differences were, so-to-speak, patched up. Finally, Mrs. Newcomb prepared an olo-graphic will on 12 May 1898 that ultimately became her last testament, which states in pertinent part:
FIRST, I have resided of late years in different places but have made the City of New Orleans my permanent home, because I here witness and enjoy the growth of the “H. Sophie Newcomb Memorial College,” a Department of the Tulane University of Louisiana, which I have founded, and has been named in honor of the memory of my beloved daughter.
I have implicit confidence that the “Administrators of the Tulane Educational Fund” will continue to use and apply the benefactions and property, I have bestowed and may give, for the present and future development of this Department of the University known as the “H. Sophie Newcomb Memorial College” which engrosses [S1my thoughts and purposes, and is endeared to me by such hallowed associations.
[[Image here]]
Third: With the exception of the special legacies and bequests herein above stated and made, I hereby give and bequeath to the “Administrators of the Tulane Educational Fund” of New Orleans, the whole of the property real, personal and mixed, of which I am now possessed or which I may leave at the time of my death, and to that end and purpose I do hereby name and constitute the said “Administrators of the Tulane Educational Fund” to be my universal legatee. [All emphasis supplied.]
Here, the universal legacy is given for the “future development of the H. Sophie Newcomb Memorial College.” Mrs. New-comb meant what she said. She wanted all of her money, both that given previously (1886 through 1898) and that bequeathed in her will, to go to and be used for a “college,” as anyone in the year 1886, 1887 through 1898, 1899, 1900, 1901, or subsequent to 1901 understood that term. A college meant a college. She did not intend that any of her money be used for an “institute” or any other purpose that the collective minds of Tulane’s Board members or their lawyers could envision, concoct, or fabricate in later years. Tulane cannot separate out that money received from Mrs. Newcomb prior to her death and that received by bequest and used for Newcomb College from monies from other sources. That is, Tulane cannot separate Mrs. Newcomb’s monies from those monies donated by third persons to *81 and for the exclusive benefit of the H. Sophie Newcomb Memorial College after 1901. And Tulane cannot separate out monies that the Board of Administrators of the Tulane Educational Fund put into the operation or physical plant of New-comb College after 1886 from Mrs. New-comb’s money. It is one giant pool of funds and no one can say that all of Mrs. Newcomb’s money has been used up or consumed prior to the date that Tulane created the Newcomb Institute. The resolutions of Tulane’s Board ratified [ 32the use of Mrs. Newcomb’s money for the sole use of Newcomb College. Tulane’s Board recognized and operated Newcomb College as a separate degree-granting entity for well over 100 years.
I find that Mrs. Newcomb did impose a conditional obligation on her donations and final bequest, and therefore, restrictions exist as to how the donations and bequest are to be used. Nothing in the nature of Mrs. Newcomb’s donations — cash money— would preclude the finding of a conditional obligation. Regarding a universal legacy, a donor may freely subject that legacy to whatsoever condition(s) he/she may choose, provided that the condition(s) is not contra bonos mores. See La. C.C. art. 1519. As noted above, in such a matter, “[t]he intent of the testator controls.” La. C.C. art. 1611(A) [Emphasis supplied].
The trial court’s consideration of extrinsic evidence beyond the four corners of the 1886 letter and the 1898 testament would have one conclude that the documents are ambiguous. This is incorrect. While the Tulane Board has modified the operation of Newcomb College over the years to conform to the changing times, it has always operated and maintained Newcomb College as a separate entity and coordinate women’s college, strongly suggesting (probably conclusively) that the Tulane Board recognized a charge upon Mrs. Newcomb’s donations. Moreover, over the years since the establishment of Newcomb College, the Tulane Board and its agents likely sought donations from third parties (including alumni) for the H. Sophie New-comb Memorial College.
Newcomb College provided its own dean, degrees, diplomas, advisors, graduates, campus, student body, senate, and programs designed for the benefit of women. Moreover, Newcomb College has its own funds, both endowed and functioning as an endowment. In June 2005, all New-comb College endowments ^totaled $41,375,651. Thus, for nearly 120 years, the Tulane Board has understood and accepted the condition Mrs. Newcomb placed on her donations inter vivos and, later, upon her donation mortis causa.
The Tulane Board, in support of its position, refers to the 1886 letter wherein she made her initial donation. Specifically, the Tulane Board quotes the following language:
But I do not mean in this my act of donation to impose upon you restrictions which will allow the intervention of any person or persons to control, regulate or interfere with your disposition of this fund, which is committed fully and solely to your care and discretion with entire confidence in your fidelity and wisdom.
The Tulane Board takes this phrase out of context by deleting the preceding language in the same paragraph, thereby suggesting that the quoted language stands alone. However, the entire paragraph reads as follows:
I request that you will see that the tendency of the institution shall be in harmony with fundamental principles of the Christian religion, and to that end, that you will have a Chapel or assembly room in which Christian worship may be observed daily for the benefit of the students. But I desire that the worship *82 and instruction shall not be of a sectarian or denominational character. I further request that the education given shall look to the practical side of life, as well as to literacy excellence. But I do not mean' in this my act of donation to impose upon you restrictions which will allow the intervention of any person or persons to control, regulate or interfere with your disposition of this fund, which is committed fully and solely to your care and discretion with entire confidence in your fidelity and wisdom.
I find the language relied upon so heavily by the Tulane Board to support its position is actually meant to remove any perceived restriction regarding the building and operation of the chapel, not to remove any restriction on Tulane |34Board’s use of Mrs. Newcomb’s money solely for the creation and maintenance of a women’s college. Again I note that the 1886 letter also states:
Feeling a deep personal sympathy with the people of New Orleans, and a strong desire to advance the cause of female education in Louisiana, and believing also that I shall find in the Board selected by the benevolent Paul Tulane, the wisest and safest custodian of the fund I propose to give, I hereby donate to your Board the sum of One Hundred Thousand Dollars to be used in establishing the H. Sophie Newcomb Memorial College in the Tulane University of Louisiana for the higher education of ... girls and young women.... ” [Emphasis supplied.]
The 1898 testament again refers to the “H. Sophie Newcomb Memorial College.” The foregoing language clearly denotes that Mrs. Newcomb wanted the money to be used for a college.
Additional evidence in the record supports this interpretation. Prior to her death, but after Newcomb College was established, and after having donated substantial sums to the Tulane Board for the purpose, Mrs. Newcomb became disenchanted with the Tulane Board’s operation of Newcomb College because Newcomb College was not being operated in accordance with her intent and purposes. Consequently, Mrs. Newcomb threatened to cease making additional donations to the Tulane Board and expressed her intention to establish a women’s coordinate college in Georgia. Based on assurances that the Tulane Board would honor her intentions in the future, Mrs. Newcomb did not follow through with her threat and continued to donate to the Tulane Board.
Similarly, in a letter dated 16 May 1910, R.M. Walmsley, President of the Tulane Board, faced with the adoption of a policy governing the use of monies from the Newcomb Fund, acknowledged Mrs. New-comb’s sole object and intent in making her donations and later bequest:
la-,[T]o create a memorial for women, in which post-graduate work can be done, and that no portion of the revenues of the fund be should be used beyond the portals of this women’s memorial college, to and within which college should be confined the entire educational outlay. [Emphasis supplied.]
Moreover, in 1987, the Tulane Board passed several resolutions regarding the continued operation of Newcomb College and reaffirmed “the intent to maintain Newcomb College as Tulane’s coordinated college for the liberal arts education of women.” [Emphasis supplied.] In order to preserve and protect the viability of this intent, the Tulane Board created the New-comb Foundation. Collectively, these actions clearly indicate the Tulane Board for over 100 years recognized, understood, and accepted the conditions imposed by Mrs. Newcomb upon her donations inter vivos and mortis causa.
*83 Having determined Mrs. Newcomb’s do-native intent, the trial court erred by denying the plaintiffs motion and granting the motion of the Tulane Board. The effect of the trial court’s ruling and now the effect of the majority’s current ruling completely frustrate Mrs. Newcomb’s intent by abolishing Newcomb College in toto.[17] However, if Mrs. Newcomb’s intent in donating the money was to maintain a women’s higher education college, her clear “intent” is the condition giving rise to the Tulane Board’s obligation to do just that— maintain a women’s higher education college. Therefore, a finding that Mrs. New-comb’s gifts were unrestricted and without conditions would be clearly wrong.
[ SfiIn Louisiana, when a choice exists between two equally reasonable interpretations, one of which will effectuate and the other which will defeat one’s intention, the court must carry out the intention. Carter v. Succession of Carter, 332 So.2d 439, 441 (La.1976). Thus, Mrs. Newcomb’s donations must be interpreted as containing a conditional obligation mandating the maintenance of a women’s higher education college.
If the Tulane Board honestly believes that it is no longer practical or possible to honor the intent of Mrs. Newcomb’s donations — the continued operation of New-comb College as a separate and viable entity for women’s higher education — our law provides an avenue to relieve Tulane’s Board from the obligation. Specifically, the cy pres doctrine, La. R.S. 9:2331, provides the Tulane Board with a means of petitioning the court for a judgment allowing it to accomplish the general purpose of Mrs. Newcomb’s will via the Tulane Board’s proposed Renewal Plan. La. R.S. 9:2331 provides:
In any case in which circumstances have changed since the execution or probate of a will containing a trust or conditional bequest for charitable, educational or eleemosynary purposes, or since the death of the donor who during his lifetime established a trust or made a conditional donation for any of such purposes, and the change in circumstances is such as to render impractical, impossible or illegal a literal compliance with the terms thereof, the district court having jurisdiction of the succession of the testator or of the domicile of the donee (and in the parish of Orleans, the civil district court) may, upon petition of a trustee, or of the person or corporation having custody or possession of the property subject to said trust, conditional bequest or donation or of any heir, legatee or donee who in the absence or invalidity of such trust, conditional bequest or donation would have been entitled to any part of the property contained therein, in accordance with the procedure hereinafter set forth, enter a judgment directing that such charitable trust, devise or conditional bequest or donation shall be administered or expended in such manner (either generally or specifically | a7defined) as, in the judgment of said court, will most effectively accomplish as nearly as practicable under existing conditions the general purpose of the trust, will or donation, without regard to and free from any specific restriction, limitation or direction contained therein.
That the Tulane Board has not exercised its rights under the cy pres doctrine begs the question as to whether it can actually establish that its continuance of Newcomb College is impractical, impossible, or ille *84 gal.[18]
Further I note, as cited by counsel in this case, La. C.C. art. 1986, which reads:
Upon an obligor’s failure to perform an obligation to deliver a thing, or not to do an act, or to execute an instrument, the court shall grant specific performance plus damages for delay if the obligee so demands. If specific performance is impracticable, the court may allow damages to the obligee.
Upon a failure to perform an obligation that has another object, such as an obligation to do, the granting of specific performance is at the discretion of the court.
Although added by La. Acts. 1984, No. 331, it is a restatement of the legal principal previously found in La. C.C. arts. 1909, 1926, and 1927 (1870). It appears that Tulane urges that article 1986 applies to them and that this court should consider that were we to grant Ms. Montgomery specific performance to order Newcomb College be returned to the position it was in before Tulane’s Board converted New-comb College to an “Institute” in 2006, we would create a burden, factually, administratively, and monetarily, that they should not have to bear. I do not embrace Tulane’s concerns about article 1986. If they failed to |3Shonor the conditions of Mrs. Newcomb’s multiple donations, both inter vivos and mortis causa, to Tulane for the purpose and uses of a college for girls and women named after her late daughter, then they are the party who must bear the consequences of their decision regardless of whether other rational people view their actions as greedy and arrogant.[19] Moreover, such further militates to a conclusion that if Tulane has a remedy at all to abolish Newcomb College, it is by filing a cy pres action pursuant to La. R.S. 9:2331. I find article 1986 offers Tulane no “safe harbor” from Ms. Montgomery’s prayer for a declaratory judgment.
I find that Mrs. Newcomb’s donations imposed a condition upon Tulane’s Board, which is that Newcomb College must continue as a degree-granting college within Tulane University of Louisiana.
Additionally, as noted in the debates of the Louisiana Constitutional Convention of 1973 and the language of La. Const.1974, art. VIII, § 14, Tulane University of Louisiana is a quasi-public, quasi-private entity. By virtue thereof, its recourse to abolish the Newcomb degree-granting entity is to proceed, as the law permits, by filing a cy *85 pres action and proving with evidence that it is no longer financially feasible to operate Newcomb College as it did for over 100 years and Mrs. Newcomb intended it to be by her inter vivos and mortis causa donations.
|s¡)Finally, I note that by agreeing with the Tulane Board we set a very bad precedent that if allowed to stand would discourage future donations to all charitable entities. Charitable giving is good and persons in our society should be encouraged, not discouraged, from make donations whether conditioned or not. That is, if a donor cannot rely upon the charitable institution to honor in perpetuity the conditions of a donation, why would one make a donation in the first place? To assume the good faith of a charity that does not want to proceed under the cy pres doctrine to be relieved of the condition of a donation works fine in theory; in practice, I find that a person with a right of action and an interest in making the charity live up to its obligation when it so graciously accepted the conditional donation in the first place is appropriate.

Summation and Conclusion

I conclude and find that all of Mrs. Newcomb’s donations, both inter vivos and mortis causa, from 1886 through her death, were made with one limited purpose, to-wit: to establish and maintain a college (or a department to use the language of the times) known as the H. Sophie Newcomb Memorial College. Tulane’s Board gratefully accepted Mrs. Newcomb’s donations and they operated through 2005 a separate, degree-granting college contained within the umbrella of Tulane University of Louisiana. For all intents and purposes, Newcomb College was a separate and distinct entity. The Tulane Board has failed to show that it is no longer economically feasible to operate Newcomb College. Rather, in 2006, they have resorted to a new interpretation of Mrs. Newcomb’s donations in spite of | ,)0what they always represented to the public at large. They sought to reinterpret Mrs. Newcomb’s written communications to mean that they could abolish Newcomb College, that separate degree-granting body, at will, taking the tack that all of her donations were unconditional and unrestricted. As a privately endowed quasi-public, quasi-private institution by virtue of their recognition in Louisiana’s constitutions, they must prove with evidence that they can no longer afford to operate the H. Sophie Newcomb Memorial College; the law affords them a cause of action and remedy to do so in La. R.S. 9:2331, relative to a cy pres action. Ms. Montgomery is entitled to the declaratory relief she prays for, to-wit, that Mrs. New-comb’s donations to the Tulane Board were subject to a condition and charge and that was for Tulane’s Board to maintain and operate the H. Sophie Newcomb Memorial College as they had from 1886 through July 2005. Thus Tulane’s Board is required, in my view, to reopen and operate the H. Sophie Newcomb Memorial College in the same manner and condition as it was operated in July 2005 and to restore Newcomb College’s endowments. I would order that they do these things forthwith. I respectfully dissent from the majority’s decision.
141 Appendix A
La. Acts, 1884, No. 43
AN ACT
To foster, maintain and develop the University of Louisiana, to that end to make the Board of Administrators of the Tulane Education Fund, as presently constituted, with the addition of the Governor, Superintendent of Public Education, and Mayor of the city of New Orleans, as ex-officio members thereof, the Administrators of *86 the University of Louisiana, which shall hereafter be known as the “Tulane University of Louisiana;” to invest said Tulane Board with all the powers, privileges, franchises and immunities now vested in, the Board of Administrators of the University of Louisiana; and with such other powers as may be necessary or pertinent to develop, control, foster and maintain it as a great university in the city of New Orleans. To give to the Administrators of the Tulane Education Fund the control, management and use of all the property of the University of Louisiana, in the city of New Orleans, for the purposes aforesaid: To exempt, in consequence of the terms of this act, and the dedication ‘of its revenues to the purposes stated in this act, all the property, real and personal, present and future, of the said Board of Administrators of the Tulane Education Fund, from all taxation, whether State, parochial or municipal: To make a contract, irrevocable and conclusive, between the State and the Administrators of the Tulane Education Fund, covering the provisions of this act: To enable the said Board of Administrators of the “Tulane Education Fund” to decline to accept the provisions of this act, unless the same, in all its provisions, be ratified and approved by a constitutional amendment, to be submitted at the next general election: To give said Board of Administrators of the “Tulane Education Fund,” upon the adoption of said constitutional amendment, not only the full powers of administration over the University of Louisiana conferred by this act, but also the power to | ^create, develop and maintain a great University in the city of New Orleans, which University so to be created shall perpetually be under their full and complete control: To enable said Board, should they act under the provisions of this act, pending the submission of said constitutional amendment, to withdraw and relieve themselves from all the effects of said action should said proposed constitutional amendment be rejected, and to provide for the submission of a constitutional amendment ratifying the provisions of this act to the people of the State at the next general election;
Whereas, Paul Tulane, Esq., formerly a resident of this State, and now of Princeton, New Jersey, with the beneficent purpose of fostering higher education in this State, did, in May, 1882, express to certain citizens of this State his intention to donate for such purposes valuable real estate to him belonging, situate in the city of New Orleans; and
Whereas, The citizens to whom the intentions of Paul Tulane, Esq., were expressed, did, by act, before Chas. G. An-dry, a notary public in the city of New Orleans, organize themselves into a corporation, under the name of the “Administrators of the Tulane Education Fund,” with the objects and purposes specified in said act of incorporation; and,
Whereas, Since the formation, of said corporation, Paul Tulane, Esq., in the execution of his previously expressed intentions, has donated to said Administrators of the “Tulane Education Fund” nearly one million dollars, the revenues whereof are to be used for the promotion and encouragement of intellectual, moral and industrial education, and has expressed his intention to largely increase said donation should this act be adopted; and,
Whereas, The said Board of Administrators of the “Tulane Education Fund,” in order to make their work fruitful in results, have expressed their desire to take charge of the University of Louisiana, in the city of New Orleans, and to devote the revenues of the property now owned, or hereafter to be owned, by said Board, to its expansion and development; and upon the adoption of a constitutional amendment *87 to that end, to apply all the revenues of property now owned, or hereafter to be acquired by them, to the creation and development in the city of New Orleans of a great University, whereby the blessings of higher education, intellectual, moral, and industrial, may be given to the youth of this State; and,
143Whereas, Under the terms of this action, as proposed by said Board, the property of said Board, and the revenues thereof, will not be used for purpose of private or corporate income or profit, but will be exclusively dedicated to school purposes, and to the service of the State in maintaining and developing the University of Louisiana, an institution recognized in the Constitution, therefore entitling the said property of said Board to exemption from all taxation, both State, parochial and municipal; therefore,

Be it enacted by the General Assembly of the State of Louisiana,

Section 1. That the Board of Administrators of the University of Louisiana shall hereafter, instead of the Board appointed as provided by section thirteen hundred and fifty-one (1351) of the Revised Statutes, consist of the seventeen administrators of the “Tulane Education Fund,” with power, perpetually, to fill any vacancy in their own number; provided, that the said Board shall, on the passage of this statute, recognize by formal notarial act the Governor of the State, the Superintendent of Public Education, and the Mayor of the city of New Orleans, as ex-officio members of said Board.
Sec. 2., Be it further enacted, etc., That the Board of Administrators of the “Tulane Education Fund,” as Administrators of the University of Louisiana shall have all the rights, powers, privileges, franchises and immunities, now vested in the Board of Administrators of the University of Louisiana by existing laws. That they shall further have full direction, control, and. administration of the University of Louisiana, now established in the city of New Orleans, in all its departments as also of all the property belonging to the State of Louisiana, and now dedicated to or used by the University of Louisiana as well as of all property controlled or used by the said University of Louisiana, and for the purposes thereof, and the Board of Administrators of the University of Louisiana are hereby empowered and directed to turn over to the Board of Administrators of the “Tulane Education Fund” all the property, rights, books, papers and archives now under their administration or control; provided, that if the custody of the State library should be transferred to the Tulane University of Louisiana, as herein established by the consolidation of the University of Louisiana at New Orleans with the Board of Administrators of the “Tulane Education Fund,” as herein provided for, through the University of Louisiana, at New Orleans, as it now exists, or otherwise, it shall be on the express condition and agreement that the State of Louisiana may resume the custody and control of said State Library, whenever it may be deemed advisable; and provided further, that after the establishment of the “Tulane University of Louisiana,” as herein provided for, and after the transfer of the custody of the State Library thereto as aforesaid, if the custody thereof shall be transferred |44to the “Tulane University or Louisiana,” as herein established, then and in that event, the State of Louisiana shall be relieved of and released from all obligations to pay the salary or compensation of the State Librarian or his assistants, as is now or may hereafter be fixed by law, during the period said State Library may remain in the custody of said “Tulane University of Lou *88 isiana;” but that during said period the salary or compensation of said State Librarian shall be paid by the “Tulane University of Louisiana.” An inventory shall be made of all the property, movable and immovable, belonging to the University of Louisiana, and transferred by this act to the control and administration of the Administration of the Tulane Education Fund, by two appraisers to be appointed for that purpose by the Governor of the State and sworn, which appraisement shall be filed in the office of the Secretary of State, as evidencing the description and appraised value of the property so transferred, and also in order that the liability of the said Administrators of the Tulane Education Fund may not be extended beyond a return of the property, so transferred, in any contingency; provided further, that the property, so transferred, may not be sold or disposed of, except under Legislative sanction; provided further, that if the “Tulane University of Louisiana,” as herein established, should cease to use the property, and exercise the privileges, franchises and immunities, now under the control and administration of, and enjoyed by the University of Louisiana, as now constituted and transferred by this Act, for the exclusive purposes intended by this Act, then and in that event the State of Louisiana shall have the right to resume the custody, control and administration of said property, and the exercise of said privileges, franchises and immunities.
Sec. 3. Be it enacted, etc., That the said Board of Administrators of the “Tulane Education Fund,” shall perpetually as Administrators of the University of Louisiana as above provided, have full and complete control of all the property and rights, and now vested in the University of Louisiana. The said Board shall have the powers above provided in addition to those conferred by its charter, by act passed before Chas. G. Andry, Notary Public, in the city of New Orleans, on the 29th day of May, Anno Domini, 1882, including the power to hold and own all real and personal property, now to said Board belonging, or hereafter to be by it acquired, during its corporate existence, for the purposes and objects of its being, or the revenues whereof are to be solely applicable to such purposes.
Sec. 4. Be it enacted, etc., That in hon- or of Paul Tulane and in recognition of his beneficent gifts and of their dedication to purposes expressed in this act, the name of the University of Louisiana be, and the same is hereby changed to that of the “Tulane University of | ^Louisiana,” under which name it shall possess all the powers, privileges, immunities and franchises, now vested in said University of Louisiana, as well as such powers as may flow from this act or may be vested in said Board, under the term of this act, from the adoption of the Constitutional Amendment hereafter referred to. The purpose of this act, being, to invest the Board of Administrators of the “Tulane Education Fund” with all the rights now vested in the University of Louisiana; to give said Board moreover complete control of said University in all its departments, and in every respect, with all powers necessary or incidental to the exercise of said control. To enable said Board, besides the powers designated by this act, to have irrevocably upon the adoption of said Constitutional Amendment, full power with the rights hereby conferred to create and develop a great University in the city of New Orleans to be named as aforesaid. Said University to be established by the said Board of Administrators of the “Tulane Education Fund” to be dedicated to the intellectual, moral and industrial educational of the youth of the *89 State, in accordance with the Charter of said Board of Administrators of the “Tulane Education Fund.”
Sec. 5. Be it further enacted, etc., That in consideration of the agreement of said Board to develop and maintain the University of Louisiana, and thereby dedicate its revenues not to purposes of private or corporate income or profit, but to the public purposes of developing and maintaining the University of Louisiana, all the property of the said Board, present and future, be and the same is hereby recognized as exempt from all taxation, State, parochial and municipal; this exemption to remain in force as long as the revenues of the said Board are directed to the maintenance of the University of Louisiana, as aforesaid, or until said Constitutional Amendment be adopted. The adoption of said amendment shall operate such exemption in consideration of the said Board expending their revenues as aforesaid, or creating, maintaining and developing a great University in the City of New Orleans; provided, that the property exempted from taxation by this act shall not exceed in value five millions of dollars, invested in real estate not otherwise exempted, which said value shall be determined in the mode required by law for the assessment and valuation of property subject to taxation, it being the true meaning and intent hereof, that all the property of the Tulane University of Louisiana, of whatsoever character, shall be exempted from taxation, State, parochial and municipal, except the excess of real estate belonging thereto, over and above the value of five million dollars, as above stated.
Sec. 6. Be it further enacted, etc., That in consideration of the vesting of the administration of the University of Louisiana in the said Administrators of the “Tulane Education Fund,” of the transfer of the rights, powers, privileges, franchises and immunities of the said |4fiUniversity to said Administrators, and of the exemption from all taxation as hereinabove provided, the said Administrators hereby agree and bind themselves, with the revenues and income of the property heretofore given them by Paul Tulane, Esq., as well as from the revenues of all other property, real, personal or mixed, hereafter to be held, owned or controlled by them, for the purposes of education, to develop, foster and maintain, to best of their ability and judgment, the University of Louisiana, hereafter to be known as the “Tulane University of Louisiana,” and upon the adoption of the Constitutional Amendment aforesaid, to perpetually use the powers conferred by this act, and all power vested in them, for the purpose of creating and maintaining in the city of New Orleans a great University, devoted to the intellectual, moral and industrial education and advancement of the youth of this State, under the terms of the donation of Paul Tulane, and the previous provisions of this act. The said Board further agree and bind themselves to waive all legal claim upon the State of Louisiana for any appropriation, as provided in the Constitution of this State, in favor of the University of Louisiana. Besides the waiver of the claim, as aforesaid, as an additional consideration between the parties to this act, the said Board agrees to give continuously, in the academic department, free tuition to one student from each Senatorial and from each Representative district or parish, to be nominated by its member in the General Assembly from among the bona fide citizens and residents of his district or parish, who shall comply with the requirements for admission established by said Board. The meaning of this provision being, that each member of the General Assembly, whether Senator or Representative, shall have the right of appointing one student, in accordance with *90 the foregoing provisions. The free tuition herein provided for shall continue until each student has graduated from the academic department, unless his scholarship has ceased from other causes. Whenever a scholarship becomes vacant, from any cause, the Senator or Representative who appointed the previous student, or his successor, shall, in the manner prescribed by this section, immediately name a successor.
Sec. 7. Be it further enacted, etc., That this act, in all its provisions be and the same is hereby declared to be a contract between the State of Louisiana and the Administrators of the “Tulane Education Fund,” irrevocably vesting the said Administrators of the “Tulane Education Fund,” with the powers, franchises, rights, immunities and exemptions herein enumerated and hereby granted, and irrevocably binding said administrators to develop, foster and maintain as above provided, the University as aforesaid in the city of New Orleans, subject to and in accordance with the terms of this act.
Sec. 8. Be it further enacted, etc., That this act, in all its terms, provisions and stipulations, without in any manner affecting the Invalidity thereof, or casting any doubt upon its constitutionality, be submitted, for ratification at the next general election by constitutional amendment, as hereinabove and hereinafter provided.
Sec. 9. Be it farther enacted, etc., That upon the passage and promulgation of this act the said Administrators of the “Tulane Education Fund,” shall have the right to avail themselves of the provisions of this act pending the submission of the constitutional amendment aforesaid. In case they should so elect to do, the said administrators, upon the passage of this law and the promulgation thereof, shall give notice of such intention to his Excellency, the Governor of this State, which notice shall authorize said Board to act under the provisions of this act and to exercise all the powers, privileges, franchises, immunities and rights which this act confers, and to undertake the performance of the duties by it imposed. In case the said Constitutional Amendments as aforesaid be not ratified, the said Board shall not in any way be held bound by its said action, but shall have the right to relieve itself of all liability growing out of such action by turning over to the Governor of the State, any property received by it from the State, or from the Administrators of the University of Louisiana, under the terms of this act, which to the extent of its imposing any obligation on the said Administrators of the “Tulane Education Fund,” shall by said return, become null and void; provided, that the said Board may in the event of the defeat of said Constitutional Amendment continue to execute and to avail themselves of the provision of this act to the full extent that, the same are legal without Constitutional enactment.
Sec. 10. Be it further enacted, etc., That sections 1357, 1362, 1363, 1365, 1366, 1367, 1370; 1372, 1373 and 1374 of the Revised Statutes, be and the same are hereby repealed, and that all laws and parts of laws conflicting in any manner with the terms of this act, be and the same are hereby repealed.
Sec. 11. Be it further enacted, etc., That at the next general election to be held in this State, there shall be submitted to the people of the State, the following amendment to the Constitution: (The terms of the Act No. [here inserting the number of this act], adopted at the session of the Legislature in the year 1884, are hereby ratified and approved; and all provisions of the Constitution of 1879 repugnant thereto, or in any way impairing the *91 passage thereof, are hereby repealed, so far as the operations are concerned.)
Sec. 12. Be it further enacted, etc., That all electors who desire to vote at said election for said amendment, shall write or print upon their ballots the words: “For the Tulane University amendment,” and all electors who desire to vote at said election against said | ^amendment shall write or print upon their ballots the words: “Against the Tulane University amendment.”

. My review of the statutes and jurisprudence indicates that the true name of the entity may be the Board of Administrators of the Tulane Education Fund. See Title to La. Acts, 1884, No. 43; State v. Board of Administrators of the Tulane Education Fund, 112 La. 432, 51 So. 483 (1910); Ex parte Steckler, 179 La. 410, 154 So. 41 (1934).

. As demonstrated by La. Const. 1845, art. 134; La. Const. 1864, art. 143; La. Const. 1868, art. 142; and La. Acts 1884, No. 43, §§ 4 and 6, the use of the words "faculties” or "department" are synonymous with the word "college” when used in conjunction with a discussion of a university. A college, as understood in the nineteenth century, was a non-specialized, semi-autonomous division of a university with its own faculty, departments, library, etc. The Online Encyclopedia and Dictionary, http://fact-archive.com/ encyclopedia/1800s. The definition of a college is not substantially different today.

. See fn. 2 above.

. It is unclear whether Mr. McConnell's representation of both Mrs. Newcomb and Tulane’s Board, as well as being an officer of Tulane, in 1897 through 1898 created an ethical conflict for an attorney-at-law at that time. Under today's Louisiana Rules of Professional Conduct for Lawyers, without full and complete appropriate disclosures to the clients of a conflict, Mr. McConnell would have a major ethical problem. Under these circumstances, such would militate to require Tulane’s Board to file a cy pres action as discussed in greater detail infra.

. I note that the New York Court of Appeal stated that "the authorities of Tulane University paid anxious and assiduous court to this old lady and her fortune.” In re Newcomb’s Estate, 192 N.Y. at 249, 98 N.E. at 954.

.At the time of all of Mrs. Newcomb's donations, La. C.C. art. 1520 (1870) read:
Substitutions and fidei commissa are and remain prohibited.
Every disposition by which the donee, the heir, or legatee is charged to preserve for or to return a thing to a third person is null, even with regard to the donee, the instituted heir or the legatee.
In consequence of this article the trebelli-anic portion of the civil law, that is to say, the portion of the property of the testator, *67 which the instituted heir had a right to detain, when he was charged with a fidei commissa or fiduciary bequest is no longer a part of our law.

. It is uncertain what tax Mr. McConnell was referring to, for no federal tax applied and Louisiana's inheritance tax, if any, was miniscule; perhaps he was referring to ad valorem taxes, but even in the late nineteenth century, nonprofit entities were not obligated to pay ad valorem taxes and such taxes were minimal. Act 43 of 1884 exempted Tulane from paying ad valorem taxes.

. Article 137 read as follows: "A university shall be established in the city of New Orleans. It shall be composed of four faculties, to wit: One of law, one of medicine, one of natural sciences, and one of letters.” [Emphasis supplied.]

. Article 143 read as follows: "A university shall be established in the city of New Orleans. It shall be composed of four faculties, to wit: One of law, one of medicine, one of natural sciences, and one of letters. The legislature shall provide by law for its organization and maintenance.” [Emphasis supplied.]

. Article 142, relative to the University of Louisiana, read in pertinent part:
A university shall be established in the city of New Orleans. It shall be composed of a law, a medical and a collegiate department, each with appropriate facilities. The general assembly shall provide by law for its organization and maintenance: Provided, That all departments of this institution of learning shall be open in common to all students capable of matriculating. [Emphasis italicized in original; emphasis in boldface supplied.]
It is interesting to note that tire redactors of the 1868 Constitution may have envisioned that the university might admit women if "capable of matriculating.” Since the 1879 Constitution was silent as to the University of Louisiana or any university of higher learning, one might suppose that Paul Tulane’s donation in 1884, resulting in the establishment of Tulane University, followed shortly thereafter in 1886 with Mrs. Newcomb's donation of $100,000, was a fulfillment of the language of the 1868 Constitution. That is, Mrs. Newcomb was giving Tulane University another college (or as was by common reference of the times referred to as a "department”) to be for women students, all as expressed in her letters that accompanied her 1886 donation. Subsequent donations inter vivos in excess of $800,000 fostered, funded, and promoted that women’s college, New-comb, at Tulane. Her 1898 testament is merely a continuation of promoting the department of Tulane University known as the H. Sophie Newcomb Memorial College.

.The entire act can also be found beginning at page 350 at:
http://books.google.com/ books?id=pekX-AAAAYAAJ & pg=PA354 & lpg=PA354 & dq= Louisiana-fact+ 43 +of +1884 & source=bl & 0ts=gRHA2m9hZJ & sig= zTylPWfiCBilGEyzwTxB2kldhZQ & hl=en & ei=fMOaS-TTJMGB8gbNu-X6DQ & sa=X & oi= book-result & ct=result & resnum=4 & ved=0CA8Q6AE-wAw# v=onepage & q= q=Louisiana% 20act% 2043% 20of% 201884 & f= false

. See fn. 1 above.

. The word “department” no longer meant "college,” but rather a group of educators dedicated to the teaching of one subject, such as English, chemistry sociology, history, et cetera.

. It appears that Mrs. Howard and Ms. Smith have taken no further action in their lawsuit against Tulane and that Ms. Montgomery has, so-to-speak, taken up the fight to reopen Newcomb College.

. Civil Code articles 1611 and 1612 are derived from Louisiana Civil Code articles 1712, 1713, and 1715 (1870). Those code articles, in effect at the time Mrs. Newcomb made her last will and testament, provided as follows:
Article 1712. In the interpretation of acts of last will, the intention of the testator must principally be endeavored to be ascertained, without departing, however, from the proper signification of the terms of the testament.
Article 1713. A disposition must be understood in the sense in which it can have effect, rather than that in which it can have none.
Article 1715. When, from the terms made use of by the testator, his intention can not be ascertained, recourse must be had to all circumstances which may aid in the discovery of his intention.

. Contrariwise, in the case at bar, Mrs. New-comb had a long history of making donations for the exclusive use and benefit of the H. Sophie Newcomb Memorial College.

. The Tulane Board apparently places emphasis on the fact that no one applied for admission to Newcomb College in 2006. This is true, but only because Newcomb College refused to accept applications to Newcomb College in 2006 and thereafter.

. The Tulane Board argues that because Mrs. Newcomb’s will does not impose any conditional obligation on her testamentary bequest, the cy pres doctrine does not apply. I disagree for the reasons articulated in detail above. I suggest, however, there are several things the Tulane Board could do to ensure continued operation of the college — i.e., redesign the college’s curriculum by eliminating all or most electives; assign regular Tulane faculty as Newcomb teaching staff part-time, paying such staff from both Tulane and New-comb's separate accounts on a proportional basis; et cetera.

. I note that Tulane’s Board has at least once previously, as noted in reported Louisiana appellate decisions, tried to ignore a testator’s conditional and restrictive bequest. That incident involves the Myra Clare Rogers Memorial Chapel. See Braquet v. Administrators of Tulane Educational Board, 304 So.2d 720 (La.App. 4th Cir.1974) and Braquet v. Administrators of Tulane Educational Fund, 419 So.2d 30 (La.App. 4th Cir.1982). One might reasonably assume that Tulane’s Board has done likewise in other circumstances where the donor or descendents of the donor either elected not to fight the issue or are unaware of the issue. Or maybe Tulane’s Board elected not to proceed beyond an unreported trial court decision for “political” reasons. One must acknowledge that it is costly to litigate against an opponent such as Tulane that has substantial financial resources upon which it can call to pay attorneys and expenses.